# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES,

        Plaintiff,              CASE NO. 17-20510
                                      HON. DENISE PAGE HOOD

v.

BRANDON DEVON JACKSON,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [#18] AND GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS [#19]

## I.      BACKGROUND

On July 14, 2017, a Complaint was filed against Defendant Brandon Devon Jackson ("Jackson"). (Doc # 1) On August 2, 2017, Jackson was charged by Indictment with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). (Doc # 12) On October 10, 2017, Jackson filed two Motions to Suppress Evidence. (Doc # 18; Doc # 19) The Government filed a Response to the first Motion on October 31, 2017. (Doc # 21) The Government filed a Response to the second Motion on November 1, 2017. (Doc # 22) Jackson filed a Reply to the first Motion on December 4, 2017. (Doc # 24)

Jackson seeks to suppress evidence obtained from the seizure and the search of his cell phone on July 5th and July 14th of 2017 (Doc # 18), and statements

Jackson made to police officers after two interrogations by Detroit police officers on the same respective dates (Doc # 19). The evidence obtained includes images and videos stored on Jackson's cell phone, and statements Jackson made to police officers regarding the information and media on his phone.

## II.    FINDINGS OF FACT

On July 5, 2017, police officers with the Detroit Police Homicide Task Force and troopers with the Michigan State Police ("MSP") Major Case Unit executed a search warrant at the residence and property at an undisputed address on Forrer Street in Detroit, Michigan. The search warrant included authorization to search vehicles within the curtilage of the residence. The officers were investigating a homicide which had taken place at a party in the early morning hours that day, allegedly involving Jackon's brother, Keevon Black-Burton ("Black-Burton") and Keevon's girlfriend Jessica Abdal ("Abdal"). Jackson had also attended the party.

Police officers had obtained the warrant on July 5, 2017 in connection with their investigation into the fatal shooting of Robert Oakes. The shooting had occurred the morning of July 5th, the day the warrant was executed. To secure the warrant, the officers relied on the following statements from an unidentified witness: (1) a fight began between Black-Burton and an unidentified male at a party at someone's home, during which Black-Burton punched the other man while

holding a gun in his hand; (2) the witness then ran out of the home to get Robert Oakes, who ran into the home; (3) the witness then heard shooting. The warrant also identified two non-fatal victims of the shooting: Keenan Black-Burton, Keevon's brother; and Jessica Abdal. Casings from two different caliber guns were found at the scene of the shooting.

Abdal was interviewed at the hospital. Abdal told police officers that Black-Burton dropped her off at the hospital, stated she knew Black-Burton to carry a gun, and that he may have been staying at his mother's home on Forrer Street. She also reported that Black-Burton had a gun at the party, but she could not remember if he shot it. Abdal could not provide Black-Burton's phone number without her phone, which she allegedly had left in her car—a 2016 GMC Terrain. Abdal also provided the license plate number for the car.

Black-Burton's mother ("Ms. Burton") arrived at the hospital while Abdal was being interviewed by police officers. Ms. Burton confirmed that she lived at the Forrer address. The affidavit states, "Jessica asked [Ms. Burton] where Keevon was and she stated she and Jessica's daughter [] were at [Ms. Burton's home] sleeping." (21-1, Pg ID 3)

One of the officers drafted an affidavit in support of a state search warrant for the mother's residence on Forrer Street. The affidavit states that the officers believed the search warrant would assist "in locating Keevon Black-Burton, the

gun that he was carrying, the clothes he was wearing at the party, and any cell phones that he carries and Jessica's cell phone." (*Id.* at Pg ID 4) The affidavit was reviewed by an assistant prosecutor and then reviewed and signed by a State of Michigan Third Circuit judge.

The affidavit and warrant specifically describes the property to be searched and seized as:

> Any and all clothing that may contain blood or DNA evidence. Any and all firearms. Any and all vehicles in the curtilage of the residence. Any and all cell phones, computers, hard drives, data storage devices used to store video and/or audio data and the contents that are contained within them. Upon seizure of an electronic device,(sic) Further you are commanded to effect a complete forensic evaluation (search) of the electronic contents of any/all computers or electronic storage devices and or cell phones, test messages, phone records . . . which may be located in the area to be searched.

(*Id.* at 2)

The warrant described Abdal's car, but did not describe the clothes Black-Burton wore to the party, nor did it describe the manufacturer or model of Black-Burton's or Abdal's phones.

Defendant Jackson and his brothers Trevon Nichols and Keenan Black-Burton were on the property at the Forrer street residence when the police officers executed the warrant. The three men were detained by police officers for safety purposes while the officers proceeded with the search. One of the police officers searched two vehicles, a black and gold Pontiac sedan and a gold Cadillac sedan, that were parked on the property where Jackson, Trevon Nichols, and Keenan

Black-Burton were being detained.  The officer found an iPhone under the radio inside the Pontiac sedan.  The officer asked the three men to identify the owner of the Pontiac sedan and the owner of the iPhone.  Jackson told the officer the car and the phone belonged to his girlfriend, Ashley Weaver ("Weaver").  Jackson added that Weaver was at work at the time, and that he had driven the car.  The officers seized the phone.

After completing the search, the officers asked Jackson if he was willing to speak with police officers at police headquarters regarding the fatal shooting that took place at the party the previous night.  Jackson signed a consent form, in which he agreed to be transported to a Detroit Police Department (DPD) facility to be interviewed, agreed to travel with a member of DPD, and acknowledged that he was not under arrest and was not being detained against his will.  (Doc # 21-2)  Jackson signed the form at 4:38 p.m. on July 5, 2017.  (*Id.*)  One of the officers transported Jackson to Detroit Public Safety Headquarters (DPSH).  Jackson rode in the front seat of the vehicle, and was never placed in handcuffs.  During the drive, the officer noticed that the seized phone kept ringing, and asked Jackson if he knew why someone named "Ro" would be calling his girlfriend.  Jackson responded by stating that the phone was his phone if "Ro" was calling.  Jackson never objected to the seizure of his phone, nor did he attempt to regain possession of the phone after acknowledging that the phone was his.

After arriving at DPSH, Jackson was questioned about the party and the events that occurred during the early morning hours of July 5, 2017. The interrogation started around 5:50 p.m. Jackson told police officers he attended the party where Robert Oakes was eventually shot, but that he left the party before the shooting took place. He told the officers his whereabouts during the shooting, and that he learned of the shooting from calls to his cell phone.

Jackson also described an argument he had during the party regarding some threats he received via social media. The threats were stored on Jackson's seized cell phone. When Jackson was first asked whether he would consent to a search of his cell phone, Jackson told the officer "no." When asked whether officers could "look at" his phone to open the phone and review the threats he received, Jackson said he would consent. Jackson told the officers the threats could be found in the phone's photos application. Investigator Ira Todd ("Investigator Todd") gave Jackson a consent form. Jackson signed the consent form at 6:46 p.m. (Doc # 21-4) Jackson consented to a forensic search of his iPhone 6 and listed the passcode to his iPhone on the consent form. (*Id.*) Jackson directed Investigator Todd and one of his colleagues to screenshots of threats he stored within his photos, and handed the phone back to the officers.

The officers continued questioning Jackson about the events at the party. Investigator Todd asked Jackson about the phone numbers of individuals being

referenced in his account of the events. At one point, Jackson told the officers "you got the numbers right there" and "you can check the phone." (Doc # 21-3, Clips 5, 6) Jackson and an officer also scrolled through his call log and identified one of the numbers in the log to be his friend. (*Id.* at Clip 7) Jackson also showed the officers a text message he sent to his girlfriend to corroborate an answer he gave to a question regarding the shooting. (*Id.* at Clip 9) At another point, Investigator Todd directed Jackson's attention to a picture on the phone, of Jackson and other people holding what appeared to be firearms. Jackson told the officer they were "prop" guns and claimed that he was not a felon. (*Id.* at 10)

A written statement was made to document the July 5, 2017 interview. The document, titled "Statement Form," categorized the statement as the product of an interview and not an interrogation. (Doc # 21-5, Pg ID 2) Jackson signed the statement. (*Id.*) The statement indicated that the interview began at 7:00 p.m. and ended at 8:50 p.m. on July 5, 2017. (*Id.*) The statement indicates that Jackson verbally agreed that (1) he gave the police officers consent to search his iPhone 6; (2) he gave his consent freely and willingly; (3) he came to the station freely and willingly; (4) that he understood he was not under arrest. (*Id.*)

Investigator Todd then began to question Jackson about the homicide. (*Id.*) At one point during the interview, Jackson asked, "can I go," to which Investigator Todd responded, "not yet." (Doc # 22-1, Clip A) Investigator Todd immediately

followed that response saying, "I mean, you can if you want to." Jackson responded, "I want to, I'm starting to feel uncomfortable." (*Id.*) Nonetheless, Jackson stayed upon further questioning. Jackson also asked how long the officers would have his cell phone. Jackson was told that he should be able to get his phone back within the "next day or so . . . ." (Doc # 21-3, Clip 12)

Jackson's phone was not returned the next day. The search of Jackson's phone allegedly did not take place until July 12, 2017. Jackson was informed that he could pick up his phone from the police station on July 14, 2017. When Jackson returned to DPSH on July 14th, he was asked if he was willing to answer additional questions about information the officers found in the phone. Jackson agreed to answer additional questions. The police officers did not limit themselves to reviewing only the threats in Jackson's photos application. Jackson was questioned about pictures within the photos application that displayed Jackson holding what appeared to be firearms, and videos of him holding firearms, rapping, and making threats to unidentified individuals. The July 14th interrogation began at approximately 1:17 p.m.

During the July 14th interrogation, Jackson indicated that he did not feel well, he wanted to get his phone back, and he wanted to leave the station. (Doc # 22-1, Clips B-D) Jackson also asked if he was under arrest. (Doc # 22-1, Clip C) Investigator Todd replied rhetorically, "You can be," and informed Jackson that he

had warrants.  (*Id.*)  Jackson was also told that he should not "ask that again" if he did not want to be arrested.  (*Id.*)  Jackson was questioned until approximately 4:12 p.m., nearly three hours, and was later arrested by federal agents.  Jackson was not allowed to leave the interrogation room and was never informed that he would be arrested.

## III.   ANALYSIS

### A. Motion to Suppress Cell Phone Evidence

#### 1.  *The Fourth Amendment*

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV.  Warrantless searches are presumptively unreasonable under the Fourth Amendment.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  A person must have a reasonable expectation of privacy in the place or property to be searched, or things to be seized, to have evidence suppressed based on a violation of the Fourth Amendment.  *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) (citation omitted).   The defendant must have shown an actual subjective expectation of privacy, and the expectation must be one that society recognizes as reasonable.  *Katz v. United States*, 389 U.S. 347, 361 (1976) (Harlan, J., concurring).  A reasonable expectation of privacy in certain information is lost once it is revealed to third parties. *Id.* at 335.

The Supreme Court has stated that cell phones "[w]ith all they contain and all they may reveal, . . . hold for many Americans 'the privacies of life.'" *Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). Society recognizes that a defendant's expectation of privacy in his cell phone is reasonable, however, a defendant must also show that he held an actual, subjective expectation of privacy at the time the phone was seized and searched. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring).

For the reasons that follow, Jackson's Motion to Suppress the evidence obtained from the search and seizure of his cell phone is **DENIED**.

## 2. *Seizure of the Cell Phone*

Jackson argues that the seizure of his phone was invalid because the warrant (1) was unduly broad; (2) failed to establish probable cause to seize many of the items described in the warrant; and (3) lacked a nexus between some of the places to be searched and items sought. (Doc # 18, Pg ID 8) The Government argues that Jackson forfeited his standing to challenge the seizure, and that his arguments lack merit because the officer who seized the phone was acting in good faith. (Doc # 21, Pg ID 9)

As an initial matter, Jackson lacks standing to challenge the seizure of his phone. A defendant has the burden of showing that he has standing to challenge a search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 130 (1978). A defendant lacks

standing to assert a Fourth Amendment violation for the search or seizure of items whose ownership the defendant has denied.  *See United States v. Tolbert*, 692 F.2d 1041, 1048 (6th Cir. 1982) ([Defendant]'s disclaimers of ownership . . . were thus not precipitated by improper conduct on the part of law enforcement agents. Accordingly, the subsequent search . . . indicated by the Court's abandonment analysis *supra,* did not offend the Fourth Amendment.");  *United States v. Peters*, 194 F.3d 692, 696 (6th Cir. 1999) ("[O]ne who disclaims any interest in [the item] thereby disclaims any concern about whether or not the contents of the luggage remain private.").  Other circuits have held the same.  *See, e.g.*, *United States v. Washington*, 677 F.2d 394, 396 (4th Cir. 1982); *United States v. Kendall*, 655 F.2d 199, 200 (9th Cir. 1981); *United States v. Canady*, 615 F.2d 694, 696 (5th Cir. 1980); *United States v. Miller*, 589 F.2d 1117, 1131 (1st Cir. 1978).

Based on the facts as presented, Jackson cannot show that he had an actual subjective expectation of privacy at the time the cell phone was seized.  Jackson told the police officer who seized the cell phone that the phone and the car searched belonged to his girlfriend, Ashley Weaver, even though he admitted that he had driven the car.  Jackson does not deny that he disclaimed ownership of the phone at the time it was seized.  Jackson did not claim the phone as his until he

became aware that "Ro" was calling the phone. Jackson lacks standing to challenge the seizure of the phone.[1]

The Court concludes that Jackson lacks standing to challenge the seizure of the cell phone because he denied ownership of the phone at the time it was seized and did not object to the seizure after recognizing that the phone belonged to him. Jackson's arguments regarding probable cause are moot because of his lack of standing.[2]

---

[1] The Court notes that Jackson has made colorable arguments regarding the seizure of the phone. In challenging the nexus of the warrant to some of the places searched, Jackson is correct in stating that the Sixth Circuit has held it is "unreasonable for officers to rely on a search warrant based on an affidavit that included no supporting facts . . . that the evidence or contraband could be found at a specific location." (Doc # 18, Pg ID 10) Jackson cited two Sixth Circuit cases, *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) ("[t]here must . . . be a 'nexus between the place to be searched and the evidence sought.'") (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)) and *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) ("[T]he affidavit must suggest 'that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought' . . . .") (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). The rationale of both cases support Jackson's position that reliance on the warrant was unreasonable because the facts presented do not establish a nexus between the evidence sought and the personal effects and vehicles of people other than Keevon Black-Burton or his girlfriend Jessica Abdal on the Forrer Street property. *Cf. United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) ("[A] suspect's mere presence . . . at a residence is too insignificant a connection with that residence to establish that relationship' necessary to a finding of probable cause.").

[2] The warrant also authorizes the seizure of electronic devices belonging to third parties unconnected to the homicide investigation. The warrant authorizes the search of vehicles unconnected to the events involving Keevon Black-Burton or his girlfriend Jessica Abdal's statements. A search warrant that authorizes an "indiscriminate sweep" is "constitutionally intolerable." *United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (quoting *Stanford v. Texas*, 379 U.S. 476, 486 (1965)). "When a warrant describes the objects of the search in unduly general terms, it raises the possibility that there does not exist a showing of probable cause to justify a search for them." *Id.* at 1275-76. The warrant is devoid of facts to support the broad authority that was granted. The Government concedes that the affidavit in support of the warrant has deficiencies. The Government argues, however, that the officers who executed the warrant acted in good faith.

**3.** *Search of the Cell Phone*

Neither party disputes that Jackson consented to a search of his phone after arriving at DPSH on July 5, 2017. Jackson argues that his consent cannot validate the search because it was tainted by his illegal detention and the initial illegal seizure of his phone. (Doc # 18, Pg ID 15) The Government argues, even if the phone was seized improperly and Jackson has standing to challenge the seizure, Jackson's subsequent consent to the search of the phone renders the legality of the seizure moot. (Doc # 21, Pg ID 17) As noted, Jackson lacks standing to challenge the seizure of the phone because he disclaimed ownership of the phone at the time it was seized.

Jackson cites *Florida v. Royer*, 460 U.S. 491 (1983) to support his position that he was illegally detained. Under the Fourth Amendment, a person is "seized" only if, viewing the totality of the circumstances, a reasonable person would believe that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Jackson was not illegally detained before giving consent to search his phone. On July 5th, Jackson agreed to travel with police officers to the DPSH to be interviewed. Although he knew he was going to be questioned by police officers, he was not the subject of the officers' investigation. Jackson also signed a statement in which he expressly acknowledged that he freely and voluntarily

agreed to be interviewed.  He also acknowledged that he knew he was free to leave the station.   Importantly,  when  Jackson  asked  whether  he  was  free  to  leave, Investigator Todd told him that he could leave if he wanted.  There is no indication that the July 5th interrogation was hostile, or that the officers coerced Jackson to come to the station or give consent to search his phone.  Jackson was not illegally detained.  Jackson's consent to search his cell phone was not tainted by the seizure of the phone nor Jackson's decision to agree to be questioned by the officers.

Jackson argues that the officers who searched his cell phone exceeded the scope of his consent.  (Doc # 18, Pg ID 16)  The Government argues that the police did not exceed the scope of Jackson's consent based on the events that took place during the interview.  (Doc # 21, Pg ID 21)

"The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (quoting *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)), *cert. denied,* ⸻ U.S. ⸻, 130 S.Ct. 655 (2009).  This is a question of fact to be determined from the totality of circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The scope of consent is defined by its express object, and measured by what the "typical reasonable person" would have "understood by the exchange between the

officer and the suspect." *United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

Jackson argues that he consented to the police taking his phone for a day or two to copy the social media threats that he received, and that the police violated the scope of his consent when they kept the phone for nine days. The Government argues that the overall context of the discussion between Jackson and Investigator Todd made it clear that the object of the search was information relevant to the homicide that took place at the party and Jackson's whereabouts at the time of the shooting.

The Government points out that Jackson told the officers to look at messages between him and his girlfriend. (Doc # 21-3, Clip 8) Jackson also directed the officers to a specific message he had sent to his girlfriend. (*Id.* at Clip 9) Jackson told the officers "you can check the phone" to see if he had a phone number for Keevon Black-Burton. (*Id.* at Clip 5) Jackson also viewed his phone's call log with the officers. (*Id.* at Clip 7) There is no evidence that Jackson attempted to limit the officer's search to a specific topic while he was reviewing the phone with the officers. *See United States v. Canipe*, 569 F.3d 597, 606 (6th Cir. 2009) (holding that the scope of consent was not exceeded when the defendant "made no attempt to revoke or delimit the scope of his omnibus consent, although he was at

or near the scene of the search"); *United States v. Garrido–Santana*, 360 F.3d 565, 576 (6th Cir. 2004).

Jackson specifically gave officers consent to review his photos application, the application of his phone where the evidence of his gun possession was discovered. Jackson also gave the police his cell phone number and passcode to allow them access to the phone without his assistance. Jackson argues that his consent limited officers to specifically reviewing the photos of the threats he had received, but gave the officers direct access to an application that contained more than the evidence of threats. While there is no evidence that Jackson consented to a general search for evidence related to the homicide, a reasonable person would have expected the officers would, at minimum, discover the other photos and videos after giving officers authority to search the application containing those files.

Jackson contends that the length of time it took the officers to return his phone exceeded the scope of his consent. However, the form Jackson signed did not specify a length of time for the search of an electronic device. There is also no evidence that Jackson attempted to limit or withdraw his consent if the search lasted more than a few days. The officer gave him an estimated time of return of the cell phone, and the actual forensic search of the phone took a day or two, from July 12 to July 14, 2017. Jackson has not presented evidence that the officers

unreasonably prolonged the search of the phone. The facts support the position that Jackson's consent to search the photos application in his phone was freely and voluntarily given. The Court finds that the officers did not exceed the scope of Jackson's consent.

### A. Motion to Suppress Jackson's Statements

Jackson argues that the statements he gave during the July 5th and July 14th interviews should be suppressed because the police officers who questioned Jackson failed to read him his *Miranda* rights while holding him in police custody. (Doc # 19, Pg ID 5) The Government responds that the Motion should be denied because Jackson was not subjected to custodial interrogation during either interview. (Doc # 22, Pg ID 1) The Court **GRANTS IN PART** Jackson's Motion to Suppress his statements.

Jackson's primary argument is that the statements from both interviews should be suppressed because he was not free to leave during either encounter with police officers. The Government argues that there was no point when Jackson's freedom of movement was restrained during either encounter. The Government does not deny that Jackson was never read his *Miranda* rights. The Court must determine whether Jackson was in custody for *Miranda* purposes because his freedom of movement was restrained.

Law enforcement officials are required to inform a person of their *Miranda* rights before subjecting them to "custodial interrogation." *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). "[O]nly where there has been such a restriction on a person's freedom as to render him 'in custody'" does the *Miranda* requirement apply. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "In determining whether a person is 'in custody' for purposes of *Miranda*, courts look to 'the objective circumstances of the interrogation' . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). A court must make the determination viewing the totality of circumstances, guided by four non-exhaustive factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Luck*, 852 F.3d at 621 (citing *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

### 1. July 5th Statements

The July 5th questioning took place at DPSH, a police facility. That factor without more, does not transform a voluntary interview into a custodial interrogation. *See Mathiason*, 429 U.S. at 495 (noting a "custodial setting is not

converted to one in which Miranda applies simply because . . . the questioning took place in a coercive atmosphere"); *Luck*, 852 F.3d at 622 (noting "location is not decisive in the custody analysis").

The interview lasted a little under two hours, however, Jackson was afforded the freedom to move around. Although Jackson did express some discomfort, he was expressly told by Investigator Todd that he was free to leave. The freedom to leave strongly supports a finding that Jackson was not in custody for *Miranda* purposes. *See Panek*, 552 F.3d at 467 (noting that an express indication that the interviewee could end the interview at will is a "particularly important factor in showing that no custody occurred"). Jackson signed a statement that day indicating that he freely and voluntarily consented to being questioned. He also confirmed that he was aware he could leave the police facility. The Court finds that Jackson was not subjected to custodial interrogation during the July 5th interview. The statements made by Jackson during the July 5th interview are not suppressed.

### 2. July 14th Statements

The July 14th questioning also took place at DPSH. The timing, nature, and directives given during the July 14th questioning were different from the July 5th interview. First, Jackson was only questioned for nearly an hour, but was held in a room for nearly two additional hours to be arrested by FBI agents. Second, the

questioning was more hostile than the first interview. Jackson and Investigator Todd both became more animated and contentious during the questioning. Third, Investigator Todd asked Jackson about his firearm possession in light of his status as a felon. The fact that Jackson initially denied that the guns were real evidences his discomfort with the line of questioning. Finally, and most importantly, when Jackson was asked if he could end the interrogation and leave, he was informed that he had warrants and could be arrested. Investigator Todd also told him not to ask to leave again. The Court finds that Jackson was subject to custodial interrogation during the July 14th interrogation. The statements Jackson made during the July 14th interrogation are suppressed.

## A. Exclusionary Rule

### 1. *Fourth Amendment*

The judicially-created exclusionary rule is designed to safeguard Fourth Amendment rights through its deterrent effect. *Herring v. United States*, 555 U.S. 135, 139-40. In deciding whether to apply the rule, courts weigh the benefits and costs of deterrence. *Id.* at 141. The benefit of some incremental deterrence must be weighed against the possibility of letting a guilty and possibly dangerous defendant go free. *Id.* A court should consider the flagrancy of the police misconduct, and evidence should be excluded only if the officer may properly be charged with knowledge that the search was unconstitutional. *Id.* at 143. The

pertinent analysis of deterrence and culpability is objective, and the question is whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances. *Id.* at 145.

Jackson has not shown a Fourth Amendment violation. The evidence obtained from the search of his cell phone is admissible.

### 2. *Miranda Exclusionary Rule*

Application of the *Miranda* exclusionary rule is broader than the Fifth Amendment itself. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). The rule may be triggered where there has not been a Fifth Amendment violation. *Id.* The Fifth Amendment prohibits a prosecutor from using compelled testimony. *Id.* at 305-06. The failure to advise a defendant of his *Miranda* warnings "creates a presumption of compulsion." *Id.* at 306. Statements that are voluntarily given within the meaning of the Fifth Amendment may still be excluded by a court if there has been a failure to advise the defendant of his *Miranda* warnings. *Miranda* provides a "remedy even to the defendant who has suffered no identifiable constitutional harm." *Id.*

"When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the . . . case in chief."

*Id.* at 317. There is "a narrow exception only where pressing public safety concerns deman[d]." *Id.*

The statements Jackson made to officers during the July 14th interrogation are suppressed because the officers subjected Jackson to a custodial interrogation and failed to advise him of his *Miranda* rights.

## IV.     CONCLUSION

For the reasons set forth above,

The Court **DENIES** Jackson's Motion to Suppress the evidence obtained from the search of Jackson's cell phone (Doc # 18).

The Court **GRANTS IN PART** Jackson's Motion to Suppress Statements made to officers (Doc # 19).  The statements Jackson made to officers during the July 14, 2017 interrogation are suppressed.  The statements Jackson made to officers on July 5, 2017 are admissible.

S/Denise Page Hood_____
Denise Page Hood
Chief Judge, United States District Court

Dated:  May 15, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 15, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry_____
Case Manager
